# THE SUPREME COURT

OF THE

## STATE OF ILLINOIS,

### JANUARY TERM, 1859, AT SPRINGFIELD.

| 21 | 64 |
|----|----|
| 138 | 523 |
| 21 | 64 |
| 166 | 527 |
| 21 | 65 |
| 182 | 522 |
| 21 | 65 |
| 201 | 410 |

THE PEOPLE, on the relation of Gustavus Koerner *et al.*, Complainants, *v.* NICHOLAS RIDGLEY *et al.*, Respondents.

#### APPLICATION FOR A QUO WARRANTO.

An information in the nature of a *quo warranto* is a criminal proceeding, and can only be resorted to in cases in which the public, in theory at least, have some interest. It is not to be allowed against persons for assuming a franchise of a merely private nature.

The information should allege that the party against whom it is filed, holds and executes some office or franchise, describing it, so that it may be seen whether the case is within the statute or not.

The persons appointed under the act of 1847, to close up the affairs of the State Bank, are not officers—they are mere trustees, and do not exercise or enjoy a franchise. The proper proceeding against them would be by bill in chancery, to which a creditor of the bank may resort.

The Executive of the State has not authority, by virtue of his office, to appoint trustees under the said act.

AT the April term, 1857, of Sangamon Circuit Court, the people, by the circuit attorney, upon the relation of Gustavus Koerner, George T. Brown and Richard Yates, informed the court that on the first day of November, A. D. 1848, by virtue of the act entitled, An Act for finally closing the affairs of the State Bank of Illinois, approved March 1st, 1847, the Governor duly appointed Nicholas H. Ridgley, Uri Manly and John Calhoun, trustees to take charge of the assets and wind up the affairs of said State bank ; that they entered upon the trust and have thenceforward continued to exercise the duties and franchises

5

thereof to the present time.    That on the 18th day of February, A. D. 1857, the Governor of the State, by and with the advice and consent of the Senate, duly removed said Ridgley, Manly and Calhoun from said trusteeship, and appointed the relators, but that said Ridgley, Manly and Calhoun continue to hold the books, papers and assets of said bank, and exercise the franchises of said trust, unlawfully, and contrary to the peace and dignity of the people.

. To this information a plea was filed, giving a history of said bank and the several acts passed in relation thereto, including the said act for winding up the same, also setting out the connection of said bank with the State, and the liquidation and adjustment of matters between the bank and the State, also reciting that the bank had conveyed to them by deed all of the assets belonging to it, and that by virtue of the deed the assets were delivered to them ; that they accepted the trust and were acting under it; that they had paid the State $50,000 in its bonds, and that the interest of the State in the bank had been relinquished to said trustees, and that as such trustees they were authorized to act and continued to act ; that they were lawfully in possession, and that they be allowed so to continue, etc.

To this plea there was a demurrer and joinder.    By agreement the issue was decided *pro forma* for the defendants, and an appeal taken to this court.

J. B. WHITE, State's Attorney, and A. LINCOLN, for The People.

S. T. LOGAN, M. HAY and J. A. McCLERNAND, for Appellees.

BREESE, J.    An information in the nature of *quo warranto*, is understood to be a criminal proceeding, ( *The People ex relatione Bush* v. *Neil Donnelly*, 11 Ill R. 552,) and can only be resorted to, in cases in which the public, in theory at least, have some interest.    We think an instance cannot be found where it has been allowed against persons for assuming a franchise of a mere private nature, not connected with the public, its interests, or its government.    *Rex* v. *Ogden*, 21 Eng. C. L. R. 62.

Our statute on this subject, (Scates' Comp. 224,) provides, section one, " In case any person or persons shall usurp, intrude into, or unlawfully hold or execute any office or franchise, it shall be lawful for the Attorney General or the Circuit Attorney of the proper circuit, with the leave of any Circuit Court, to exhibit to such court an information in the nature of a *quo warranto* at the relation of any person or persons desiring to sue or prosecute the same," etc.    The second section authorizes a

judgment of ouster and the imposition of a fine, besides costs. This statute is, substantially, a copy of the statute of 9 Anne, ch. 20. Both are pointed at the usurpation of, intrusion into, or unlawfully holding and executing certain offices. The offices are specified in the 9th Anne, as offices and franchises in corporations and boroughs, in our statute they are not specified, and that seems to be the only real difference between them. The statute of Anne applies only to corporate offices, and franchises of a corporate nature, in corporate places.

But at common law before this statute, we understand informations were filed and sustained in the nature of *quo warranto*, in cases not relating to any corporate office or franchise of a corporate nature in a corporate place, as in cases where a party unlawfully took upon himself to act in any public capacity, touching the rule and government of any place in England or Wales, or the administration of justice, or the political rights of third persons.

The usual object of an information of this nature, is, to call in question the defendant's title to the office or franchise claimed and exercised by him, because of some alleged defect therein, as for instance, that at the time of the election he was disqualified to be elected; or that the election itself was void or irregular; or that the defendant was not duly elected or not duly appointed; or that he has not been duly sworn in, or otherwise unlawfully admitted; or that he has since become disqualified,. and yet presumes to act. A defective title is understood to be, and is, in contemplation of law, the same as no title whatever, and a party exercising an office or franchise of a public nature, is considered as a mere usurper unless he has a good and complete title in every respect. This court has decided that the people are not required to show anything. The entire *onus* is on the defendant, and he must show by his plea, and prove, that he has a valid title to the office. He must set out by what warrant he exercises the functions of the office, and must show good authority for so doing, or the people will be entitled to judgment of ouster. *Clark* v. *The People ex relatione Crane*, 15 Ill. R. 217.

The information, however, must allege that the party against whom it is filed, holds and executes some office or franchise, describing it, so that it may be seen the case is within the statute. This information contains no such averment, nor anything equivalent to it. The allegation is, that the Governor appointed the defendants trustees, to take charge of the assets and wind up the affairs of the State Bank, and that they, then and there, entered upon said trust, and thenceforward have in fact continued to execute the duties and franchises thereof to the present

time." It is then averred that the Governor, by and with the advice and consent of the senate, duly removed them from " the said trusteeship," and duly appointed the relators " their successors in said trusteeship," of which the defendants had notice ; concluding with the averment that the defendants " continue to hold and exercise the books, papers and assets of said bank, and the franchises of said trust, unlawfully, and contrary to the peace and dignity of the people," etc.

There is no distinct averment that the defendants hold or execute any office or franchise, so that the demurrer to the defendants' plea in bar might well have been carried back to the information, for it does not present the statute offense in any sufficiently legal or technical form. *The People ex relatione Gillenwater* v. *The Mississippi and Atlantic Railroad Co.*, 13 Ill. R. 66. And the defendants, for the same reason, might successfully have defended against the information, by interposing a general demurrer, for admitting, which the demurrer would do, all the allegations to be true, no case is made out against the defendants. In truth, the affirmative facts that they were appointed by the Governor the trustees of the bank, and have taken upon themselves the execution of the trust, and at the time of filing the information, were executing the trust, make a case for the defendants, for the validity of their appointment is not assailed.

The real question, as the relators have made it, and argued it, is, has the Governor the power to remove the defendants from the trust ? It is contended by the relators that the Governor has such power—that although they are called trustees, they are in fact public officers, and " the trusteeship " is an office or franchise in which the public have an interest, and its incumbents are necessarily under executive control.

We will not question that the power of removal from office, where the tenure is not defined by the constitution or law whence the appointment originates, resides with the power to appoint, and were this trust committed to the defendants by the Executive, a public office, we would not hesitate to accord to him the right to remove them. But is it an office ?

An office is defined to be a right to exercise a public function or employment, and to take the fees and emoluments belonging to it, and they are civil and military, and the civil are divided into political, judicial and ministerial. Of the former, the president, and the governors of states, heads of departments, members of congress, of the legislature, etc., are examples. The judicial are those which relate to the administration of justice, and cannot be exercised by deputy. The ministerial are those wherein the officer has no power to judge of the matter to

be done, but must act in obedience to the orders of a superior, and the duties of which can be performed by deputy. All offices in this country are public. Some employments of a private nature are considered offices, if connected with the public, as a bank or railroad president, treasurer, or secretary, or director. 2 Black. Com. 31; 3 Kent Com. 454.

The act under which the defendants were appointed, does not declare the trust to be an office, nor in the manner of their appointment was it considered an office. It has none of the indications of an office—no tenure is prescribed—no fees or emoluments allowed, and no salary—nor is any oath required to be taken. As the relators define it in their information, it is a mere " trusteeship," the duties of it being to take charge of the assets and wind up the affairs of the State Bank, pay out its specie on hand *pro rata*, and issue certificates of indebtedness to bill-holders and other creditors; in one word, to administer on the effects of a defunct corporation. These were duties of a special character, applicable alone to a particular corporation, and nothing more. It has none of the constituents of an office, none whatever. The defendants have the legal title to all the property assigned, to hold to them and the survivors of them, so that by judgment of ouster they could not be divested of this title. This can only be done by bill in chancery.

Is it a franchise? A franchise is said to be a right reserved to the people by the constitution, as the elective franchise. Again, it is said to be a privilege conferred by grant from government, and vested in one or more individuals, as a public office. Corporations, or bodies politic are the most usual franchises known to our laws. In England they are very numerous, and are defined to be royal privileges in the hands of a subject. An information will lie in many cases growing out of these grants, especially where corporations are concerned, as by the statute of 9 Anne, ch. 20, and in which the public have an interest. In 1 Strange R. (*The King* v. *Sir William Louther*,) it was held that an information of this kind did not lie in the case of private rights, where no franchise of the crown has been invaded.

If this is so—if in England a privilege existing in a subject, which the king alone could grant, constitutes it a franchise—in this country, under our institutions, a privilege or immunity of a public nature, which could not be exercised without a legislative grant, would also be a franchise.

There must be some parting of prerogative belonging to a king, or to the people, under our system, that can constitute a franchise. Upon these defendants, nothing of that kind was conferred. The State having, at the time of their appointment as trustees, an interest of $50,000 in the bank, it was no doubt

an amicable arrangement with the bank that the Governor should name the trustees. But at that time, the charter was forfeited, and no franchise remained.

The defendants were appointed trustees on the 31st October, 1848, on which day the bank, being in liquidation, conveyed to them, by deed duly executed and recorded, all the assets of the bank, real and personal, in trust for the purposes mentioned in the deed, and possession was delivered to them. This deed refers to the 2nd section of the act of 1847, and recites that " the Governor having designated the said Uri Manly, John Calhoun and Nicholas H. Ridgley, as the three trustees to be appointed by him under the provisions of that act; now, this indenture witnesseth," etc. By this deed the legal title passed to these defendants.

At this date, the State was still interested in the bank, to the extent of $50,000, and it was just and right, and a partial guarantee to the public, that this interest should be looked after by agents of her own selection. But on the first of July, 1852, this interest was conveyed to the trustees, as such, on their surrender to the State, of an equal amount of State bonds and other evidences of indebtedness, and from that day, henceforward, the State had no interest whatever in the bank or corporation. All that remained in the bank, and of the bank, belonged to its numerous creditors, any one of whom, could, on any day since that date, have filed in chancery a bill against the trustees for an account, and for their removal, and for the appointment of others more trustworthy, the State being in no wise responsible for their conduct, or interested in their accounts.

The deed executed by the bank to the defendants, conveys the legal title to all the assets, real and personal to the defendants, of which the joint action of the Governor and Senate cannot deprive them, but a court of chancery can. That court can give adequate relief. It is a case wholly for the courts, with which, neither the executive nor the legislature can rightfully interfere, nor can we in this proceeding, for if judgment of ouster is rendered, the title to the assets is still in the defendants.

These defendants have a high duty to perform, but it is to the creditors of the bank, and its stockholders. They are trustees for them, and can only, by their mal-administration of its affairs, injure them, and to them the courts will hold them responsible, on a proper case made. If the creditors are satisfied with the manner in which the trust is being executed, who shall complain? The public, as such, have not a particle of interest in the matter, in any view in which we can regard the case. It is a clear case between trustee and *cestui que trust*—who are, not the people, but its creditors and stockholders.

Had the legal estate in the assets passed to the relators by an adequate conveyance, then indeed there might be some pretense of right, to file an information.

The act of 1847, under which the defendants were appointed, refers to the act of 1845, specially applicable to the Bank of Illinois at Shawneetown, which act is to govern in winding up the bank, as far as applicable. By the 13th section of that act, on a vacancy occurring in the board of assignees, it was to be filled by the remaining assignees—if they fail to fill it, then the Governor is to fill it.

It cannot be pretended under this act that the Governor could make vacancies by his own act, and fill them by his own appointment. The very nature of the trust and the business to be performed under it, forbids the idea that it should be subject to the politics of the country and its many fluctuations.

In every aspect in which we can view this case it seems a clear case for the defendants, and we think the plea is a full and complete bar to the information, and shows a case in which the executive has no power to interfere.

As the merits of the case have been thoroughly examined and considered in this proceeding, we make no question as to its propriety as applicable to this case.

The judgment of the Circuit Court on the demurrer is affirmed, the plea of the defendants being a full answer and bar to the information.

CATON, C. J., did not hear the argument in this case, and gave no opinion.

*Application denied.*