## The Chicago City Railway Company

*v.*

## The People *ex rel.* Allan C. Story.

1. BURDEN OF PROOF—*in quo warranto.* In proceedings in the nature of *quo warranto,* the people are not bound to show anything. The *onus probandi* generally lies on the defendant, who must prove his title as pleaded, or such part of it as is traversed.

2. EVIDENCE—*when slight is sufficient.* Where the right to allow a city railway in a public street was made to depend upon obtaining the consent of the owners of two-thirds of the property on such street, by lineal measure, after the lapse of over ten years, and the acquiescence of property holders, and the destruction of all written evidences by fire, it was *held,* that slight evidence was sufficient to establish the fact of consent.

3. LICENSE—*power to waive forfeiture.* Where a railway company was authorized by its charter to construct and maintain a railway in a certain part of the city of Chicago, over and along such streets, etc., as the common council had or might authorize, in such manner and upon such terms and conditions as the common council had or might contract with the company, and, by ordinance of the city, license was given to lay a single track along a certain street to the city limits within fifteen months, and the same was constructed half the way within the time required: *Held,* that the common council had the right and power to waive the condition as to the time for completing the same, it being a provision in favor of the city to secure the public interests.

73  541
130  55

73  541
152  185

73  541
53a 307
54a 361

73  541
164  77

73  541
183  233

73  541
90a  ⁶483

73  541
192  ⁶311
192  ¹312

73  541
197  ⁸454

73  541
199  ³347
199  ⁴347

73  541
104a ⁵540

73  541
212  ⁶592

542     C. C. R. W. Co. *v.* The People *ex rel.*     [Sept. T.

Opinion of the Court.

4. Forfeiture—*who may waive.* If the State, in granting a franchise, imposes a limitation or condition that a certain thing shall be completed within a given time, no other power can waive the forfeiture arising from the non-performance of the condition. But where a mere license is granted by a city upon condition subsequent, it may, for satisfactory reasons, waive a strict performance of the condition.

5. Franchise—*defined.* In the American States, a franchise is a privilege emanating from the government or sovereign power, and owes its existence to a grant, or, as at common law, to prescription, which presupposes a grant, and is vested in an individual or body politic. The State alone can waive the forfeiture of a corporate franchise.

6. Same—*distinguished from license.* Where a company is incorporated by the legislature, with power to construct, maintain and operate a railway in a city, upon the consent of the city, in such manner and upon such conditions as the city may impose, and the city, by ordinance, grants the privilege of constructing and operating the same upon a certain street, the grant by the city is a mere license, and not a franchise. The franchise emanates from the State.

7. Constitutional law—*prohibition against special privileges.* The constitutional prohibition as to the grant of any special or exclusive privilege, immunity or franchise, is a limitation upon the power of the General Assembly, and can not be construed as a limitation upon the power of a municipal corporation to designate certain streets and fix the conditions upon which a railway company, organized under a special charter previously granted, may build and operate its road.

8. Forfeiture—*of corporate franchise.* Courts proceed with great caution in proceedings which have for their object the forfeiture of corporate franchises. It is not every act of non-performance of the condition in the act of incorporation, or every misuser, that will forfeit the grant. A substantial performance, according to the intent of the charter, is all that is required.

Appeal from the Circuit Court of Cook county; the Hon. Erastus S. Williams, Judge, presiding.

Messrs. Hitchcock & Dupee, for the appellant.

Mr. D. L. Shorey, for the relator.

Mr. Justice Scott delivered the opinion of the Court:

That large and important property interests, as well as the public convenience, are involved in this litigation, is apparent. Elaborate and interesting arguments have been made, present-

ing the case, in all its phases, fully and exhaustively. We shall, however, avoid the consideration of all questions having no direct bearing on the decision we are about to announce. After all, in the view we have taken, the case is controlled by elementary principles that admit of but little discussion.

The information filed by the acting Attorney General is in the nature of *quo warranto*, is general, and charges the Chicago City Railway Company with the using and usurping franchises without warrant, grant, charter or authority of law. Respondent pleaded the acts of incorporation, the several ordinances of the city of Chicago authorizing the construction of a railway on certain streets, all licenses obtained, and allege " the company has at all times complied with and fulfilled all and singular the requirements and conditions of all acts, ordinances, resolutions and papers above mentioned or set forth." Replications filed confined the issues to matters concerning the franchises on Indiana avenue, and it is only sought to have declared a forfeiture of the franchises of the railway company on that avenue from Twenty-second street to the southern limits of the city.

Shortly stated, the undisputed facts appearing in the pleas, necessary to an understanding of the issues formed, are: In 1859, the Chicago City Railway Company was incorporated, under an act of the General Assembly. By the second section, the corporation is authorized and empowered to construct, maintain and operate a single or double track railway, with all necessary and convenient tracks for turnouts, side tracks and appendages, in the city of Chicago, and in, on or over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the south or west divisions of the city, as the common council have authorized the corporators, or any of them, or shall authorize the corporation so to do, in such manner and upon such terms and conditions, and with such rights and privileges, as the common council has or may contract with the parties, or any or either of them, prescribed.

The duration of the corporation, by the original charter, was

limited to twenty-five years, but by an amendment, passed in 1865, it was extended to ninety-nine years. Under this latter act, it was competent for the common council, with the written consent or concurrence of the other party or parties, or their assigns, to any of the contracts, stipulations, licenses or under-takings, to amend, modify or annul the same.

An ordinance, passed August 22, 1864, conferred upon the railway company authority, in consideration of the acceptance of its provisions, to construct, operate and maintain a single track railway, with all necessary turnouts, side tracks and switches, in, upon and along Indiana avenue, from Twenty-second street to the limits of the city, provided the consent of the owners of two-thirds of the property, by lineal measure, fronting on that street, should be first obtained. Under its charter by permission given in the ordinance, the company did construct its railway on Indiana avenue, from twenty-second street south to Thirty-first street, completing the work in September, 1865, but had not extended it further south in the direction of the city limits when this proceeding was com-menced.

Two replications, stating the grounds of forfeiture, were filed to repondent's pleas: First, the railway company did not obtain the consent of the owners of two-thirds of the property, lineal measure, fronting on Indiana avenue; and, second, the railway company did wilfully, wrongfully and unlawfully neg-lect and refuse to construct its road on Indiana avenue, from Twenty-second street to the city limits, within fifteen months from the passage of the ordinance of August 22, 1864.

Respondent traversed the averments of both replications, and for further rejoinder set up an ordinance, passed Novem-ber 13, 1871, amendatory of the ordinance of August 22, 1864, by which the time for the completion of the railway to the city limits was extended for a period of two years from the date of the ordinance; and in case the company should be delayed, by injunction or order of court, the period of such delay should be added to such extended time, and the right and authority of the company to maintain and use its tracks then existing

on Indiana avenue were confirmed for the time provided in the ordinance. Upon the trial of the issues of fact formed upon the first replication, the court, although ruling the *onus probandi* was upon respondent, found that consent of owners of two-thirds of the property fronting on the avenue had been obtained within fifteen months of the passage of the ordinance of August 22, 1864, and prior to laying down the track to Thirty-first street, but found the company had neglected and refused to construct its railway to the city limits within fifteen months from the passage of the ordinance, and pronounced judgment of ouster for that cause. To reverse that judgment the railway company brings the case to this court on appeal. Both parties have assigned errors.

While the people have assigned for error, the finding of the court that the consent of the owners of two-thirds of the property fronting on Indiana avenue had been given to laying the track on that street, was against the weight of the evidence, the railway company insists the court ruled incorrectly the burden of proof as to that fact rested upon it.

The doctrine of the cases on this subject seems to be, in proceedings by information in the nature of *quo warranto*, the people are not bound to show anything. The *onus probandi* generally lies on the defendant, who must prove his title as pleaded, or such part of it as is traversed by the replication. It has been so held by this court. *Clark* v. *The People*, 15 Ill. 217; *The People* v. *Ridgley*, 21 Ill. 65.

Whether any exception to this general rule obtains in cases where the act charged to work a forfeiture implies a violation of a public law, or would impute to the party crime that might subject him to punishment, on the ground of the presumption in favor of the defendant's innocence, is a question upon which it is not necessary, at this time, to express an opinion. We are satisfied the finding of the court on the question of fact submitted, was warranted by the weight of the evidence. By the ordinance, the railway company was first to obtain the consent of owners of two-thirds of the property fronting on the avenue to laying its track. How the consent was to be ex-

pressed, or whether it should be verbal or in writing, the ordinance was silent. All written evidence of consent in possession of the company had been destroyed by fire in 1871. Consent could have been expressed orally, or it may be inferred from the acquiescence of owners of property affected. The ordinance under which the track was laid was published, and a canvass made to obtain the consent of the property owners along the line. After the lapse of so great a period, slight evidence will be sufficient to establish the fact of consent on the part of owners of property. It was known to the public the terms upon which it was lawful for the company to construct its road upon that street. If this litigation was between private citizens, in view of the facts proven we should not hesitate to say, owners of property on that street would be estopped to deny the requisite consent was given. But, regarding the burden of proof as resting upon the railway company to establish the fact of consent, it can only be expected to make such proof as the nature of the case is susceptible of, even against the demand of the people. As we have seen, all written evidence has long since been destroyed. Consent, in some instances, may have been given orally, and all means of proving it now lost or forgotten. The longer delay that intervened, the more difficulty would be experienced in proving, by any positive testimony, the requisite consent of owners of property. Under the circumstances proven, and in view of the difficulties occasioned by the destruction of evidence, we regard the finding of the court, the consent of owners of property to laying the track in 1865 was first obtained, is sustained by the testimony. Were it a question of first impression with us, we should, no doubt, reach the same conclusion.

Treating the provision of the ordinance of August 22, 1864, that the road should be completed to the city limits within fifteen months, as a condition upon which the license was granted, the non-performance of which would work a forfeiture, we will next consider the legal effect of the amendatory ordinance of November 13, 1871, extending the time for the completion of the road, and affirming the rights of the company.

Under the act of 1865, the common council had authority "to amend, modify or annul" the contract created by the ordinance of August 22, 1864, with the consent of the railway company. The limitation in respect to the time in which the road should be finished, was a provision in favor of the city to secure the public interests, and the law is, a party may waive the benefit of a statute where it contravenes no matter of public policy. This right the city had, independently of any enabling act. It was the sole judge whether the public exigency required an extension of time, or any other modification of the contract. Had the State, in granting the charter, imposed this limitation upon the railway company, no other power could waive the forfeiture arising from the non-performance of the condition. But that is not this case. Here, the grant made by the city was in the nature of a license to the railway company to construct its road upon a certain street within a fixed period, and we are unable to perceive any reason why it could not, for satisfactory reasons, waive a strict performance. The authorities cited by counsel for appellee, are cases where the conditions were imposed by the act of incorporation conferring the franchises. In such case the uniform rule is, the State alone can waive a forfeiture of a corporate franchise consequent upon a failure to comply with the conditions upon which it was granted. Had the condition inserted by the city in the ordinance been contained in the charter of the company, the cases cited would be in point, and conclusive as to the law. But in the case at bar the grant in the ordinance is not a franchise, but a mere license, a permission to construct a railway in a certain street within a limited period. A franchise, according to the definition given by Blackstone, is a royal privilege, or branch of the king's prerogative, subsisting in the hands of the subject, and, being derived from the crown, must arise from the king's grant. 2 Blackstone, 17. Corporate franchises in the American States emanate from the government, or the sovereign power, owe their existence to a grant, or, as at common law, to prescription, which presupposes a grant, and are vested in individuals or a body politic.

The grant or license given by the ordinance comes within no definition of a franchise. Besides, a municipal body, it is understood, possesses no power to confer a franchise. *Davis* v. *The Mayor*, 4 Kernan, 506.

Being a mere license, under the franchises conferred by the State to the railway company, to construct its road within a given period, upon ground over which the city had exclusive control, it could waive a strict performance of the condition as to time. The license granted by the ordinance is no more a franchise than would be a grant of the right of way by a private citizen to the company to construct its road over his lands, and it is as competent for the city as for a private owner to extend the time of performance, or to amend, modify or annul the contract by mutual agreement.

But it is said, the ordinance of November 13, 1871, purports to grant "special privileges" or "franchises," and is void under the constitution. As we have before seen, there is no authority for the assumption the license to the railway company to construct its road on Indiana avenue is a franchise. Herein consists the vice of the whole argument on this branch of the case. At most it was but a mere license, and comes within no definition of a franchise, nor does it emanate from any source competent to grant a franchise. But more than this, it does not purport to grant any special privileges to the railway company that would exclude a like grant to any other company that possessed competent authority to construct a railway upon that street.

Article 4, section 22, of the constitution of 1870, cited, is a limitation upon the power of the General Assembly to grant any corporation, association or individual the right to lay down railroad tracks or amend existing charters for that purpose; but by no construction can it be said to be a limitation upon a municipal corporation to designate certain streets and fix the conditions upon which a railway company, organized under a special charter, previously granted, or under a general law since the adoption of the constitution, might lay its track. It is a misconception of the law to suppose the railway

company derives its power to construct a railroad from any ordinance of the city. All its authority is from the State, and is conferred by its charter. The city has delegated to it the power to say in what manner and upon what conditions the company may exercise the franchises conferred by the State, but nothing more. The authority of the city in this regard is not affected by the provisions of the constitution which inhibit the granting by the General Assembly of any special or exclusive privilege, immunity or franchise. Whether it is in the power of the State to revoke that authority, is a question that does not arise for decision, and upon which we refrain from expressing any opinion. It is sufficient it has not been done by any provision of the constitution, nor by any general law enacted by the legislature. Accordingly, we are of opinion the ordinance of November 13, 1871, amendatory of the former ordinance, is valid, and a waiver of the condition as to the completion of the road to the city limits within the period fixed by the first ordinance. Courts proceed with great caution in proceedings which have for their object the forfeiture of corporate franchises. It is not every non-performance of the condition in the act of incorporation, or every misuser, that will forfeit the grant. A substantial performance according to the intent of the charter is all that is required. *The People* v. *Kingston and Middletown Railroad Co.* 23 Wendell, 193; *The People* v. *Bristol Turnpike Co.* ib. 222.

It is not insisted there has been any non-compliance with the conditions of the charter of the railway company, or any misuser, that would forfeit its franchises. The non-performance insisted upon is, as to the condition of the ordinance imposing a limitation as to the time in which the railroad on Indiana avenue should be constructed to the city limits. There was a part performance. The city reserved the right, in case the public interests required any of the lines to be constructed, to compel the completion of the same within ninety days. It laid no such injunction upon the railway company. On the contrary, it extended the time for the performance, and by an ordinance, curative in its character, confirmed the rights of the

company on Indiana avenue during the time provided in the ordinance.

For the reasons indicated, the demurrer to the second rejoinder setting up the ordinance of November 13, 1871, should have been overruled, and judgment should have gone for the respondent. Accordingly, the judgment will be reversed and the cause remanded.

*Judgment reversed.*

Mr. Justice Sheldon, dissenting:

I am unable to concur in the view of the majority of the court, as to the valid force of the ordinance of the common council of the city of Chicago, of November 13th, 1871.

By its act of incorporation, approved February 14, 1859, the Chicago City Railway Company was authorized and empowered to construct and operate a single or double track railway, in, on, over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the south or west divisions of the city of Chicago, as the common council of said city have authorized said corporators, or any of them, or shall authorize said corporation so to do, in such manner, and upon such terms and conditions, and with such rights and privileges, as the said common council has, or may, by contract with said parties, or any or either of them, prescribe.

By an ordinance of the common council of the city of Chicago, passed August 22, 1864, the company was authorized to lay down a single track railway, on Indiana avenue, from Twenty-second street to the city limits, which were two miles south of Twenty-second street, provided the consent of the owners of two-thirds of the property, by lineal measure, fronting upon the street, should first be obtained; and the ordinance requiring that the railway should be constructed within fifteen months after the passage of the ordinance.

The company proceeded to construct a track from Twenty-second street, one mile south to Thirty-first street, completing

the same in September, 1865, and, from that time to this, has not built further south.

The information, in the nature of a *quo warranto*, was filed at the July term, 1870, of the Cook county circuit court, and the bill for an injunction, September 12, 1871, to restrain the construction of any railway track on Indiana avenue south of Thirty-first street.

The ordinance of November 13, 1871, purported to be amendatory of that of August 22, 1864, and extended the time for the construction of the railway on Indiana avenue, for the term of two years from the passage of the ordinance of November 13, 1871, (any time of delay caused by any injunction, to be deducted,) and authorized the construction of a double track railway on said avenue, from the north line of Twenty-second street to the city limits, requiring the consent of the owners of the majority of the property, by lineal measure, fronting upon said avenue, between Twenty-second street and the city limits.

I can not but think that, since the adoption of the constitution of 1870, the common council had no power to pass the ordinance of November 13, 1871, so far as it gave to the company any right to lay down a railway track on Indiana avenue. Section 22, article 4 of that constitution, provides that, " The General Assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: for granting to any corporation, association or individual the right to lay down railroad tracks, or amending existing charters for such purpose; granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise, whatever. In all other cases where a general law can be made applicable, no special law shall be enacted."

By the terms of its charter, no right is thereby vested in the Chicago City Railway Company, to use any street in the city of Chicago for railroad purposes, except as had been previously authorized by the common council. It can only lay down its railroad track on such streets as the common council of Chicago shall authorize it to do, and in such manner, and

upon such terms and conditions, and with such rights and privileges, as the common council shall prescribe.

At the time of the passage of the ordinance of November 13, 1871, it is apparent that the City Railway Company did not have the rights which that ordinance purports to have conferred. Had the legislature itself, at that time, granted such rights to this company, the act would have been in plain violation of the constitution, as granting by a special law to a corporation the right to lay down a railroad track, and as granting by a special law, a special privilege to a corporation. How can it be, then, that the common council of the city of Chicago can, by a special ordinance, give to a corporation the right to lay down railroad tracks, when the legislative power of the State can not, by a special law, do so? That the agent can exercise a larger power than the principal? It is a general rule of law, that the derivative authority expires with the original authority from which it proceeds.

The derivative authority can not, generally, mount higher, or *exist longer*, than the original authority. Story on Agency, § 481. Cities but exercise certain powers of government within a limited district, which have been delegated to them by the legislature, and the powers may be recalled at pleasure. *The People* v. *Purdy*, 2 Hill, 31; *The People* v. *Morris*, 13 Wend. 324; *Town of Freeport* v. *Board of Supervisors*, 41 Ill. 495; *State Bank of Ohio* v. *Knoop*, 16 How. 369; Dillon on Mun. Corp. sec. 30.

The power which the common council of Chicago had, prior to the adoption of the constitution of 1870, to grant the privileges attempted to be conferred by the ordinance of November 13, 1871, I conceive to be inconsistent with the provisions of that constitution, and, therefore, abrogated thereby. In *State* v. *Maynard*, 14 Ill. 419, this court, in reference to the constitution of 1848, said: "When the new constitution took effect, any provision of a former law, which was inconsistent with it, became as much unconstitutional as if the law had been subsequently passed. A law can not be in force in the State, no matter when passed, which contravenes the provi-

sions of the constitution of the State." Numerous are the cases where this court has held that prior laws were abrogated by the present constitution, because of being inconsistent therewith. It does not consist with the constitution, that a city should, by a special ordinance, give to a corporation the privilege to lay down a railroad track in a street, when the legislature itself has been prohibited, by the constitution, to grant, by a special law, such a right, or to amend existing charters for such purpose, and to grant, by special law, to any corporation, any special or exclusive privilege or franchise whatever.

But it is said in argument that the provisions cited, of section 22, article 4 of the constitution, are restrictions upon the legislature, and not upon municipal bodies; that they concern laws and not ordinances. As said in Cooley's Const. Lim. 198, "The power of municipal corporations to make by-laws is limited in various ways. It is controlled by the constitution of the United States, and of the State. The restrictions imposed by those instruments, and which directly limit the legislative power of the State, rest equally upon all the instruments of government created by the State. If the State can not pass an *ex post facto* law, or law impairing the obligation of contracts, neither can any agency do so, which acts under the State with delegated authority. * * and whatever the people, by the State constitution, have forbidden the State government from doing, it can not do indirectly through the local government."

It is conceived that what are restrictions upon the legislature, are alike restrictions upon their governmental agencies, municipal corporations; and that, as respects the question in hand, it is to be viewed in the same light as if the company's charter had required the authority for the use of particular streets, to be obtained from the legislature, instead of from the common council of the city.

Had such been the case here, it is believed that it would not be contended that the General Assembly would, on November 13, 1871, have had the power, by a special law, to grant such authority to this corporation. No more, it is conceived,

could the common council of Chicago do so at that time—the power to grant such authority having been conferred, as it was, upon it, instead of upon the legislature.

These special privileges of the rights of the railway upon particular streets, are said to be conferred, not by the city by its ordinance, but by the State by the company's charter, and that the city only regulates the use. If this were so, the company, under its charter, might have constructed its railway on Indiana avenue, and if the city failed to regulate its use, the right to maintain the franchise on that street would be complete. But the railway company only took, under its charter, a right to obtain authority from, and contract with the city, for the privilege of the use of Indiana avenue, and it could acquire the right to exercise no franchise thereon, except through such authority and contract. The right to lay down a railroad track upon that avenue was not complete by the charter. In order to the completion of the right, the authorization of the city was essential. If, at the time of the passage of the ordinance, such right could not have been specially granted, it is not perceived how anything in completion of the right could have been conferred by the ordinance.

It does not seem to be a sufficient answer in the case, that the ordinance of November 13, 1871, is, in effect, but the waiver of a forfeiture for not constructing the railway track within the time limited by the ordinance of August 22, 1864; and that the common council might waive such forfeiture. That might be, if the common council had at that time, November 13, 1871, possessed the power to give authority to the company to lay down the railway track. But not having such power at that time, it having been taken away by the constitution, the common council could not, by waiver of a forfeiture, accomplish the effect of giving or allowing to the railway company the authority to lay down a railroad track in a street, which privilege it would not have but for such waiver of forfeiture. It is conceived that, at that time, no authority could directly or indirectly have been got, by any action whatever of the common council, to lay down this railway track.

The ordinance of November 13, 1871, too. is more than a waiver of any forfeiture; it gives the privilege to lay down a double track from Twenty-second street to the city limits, when the previous ordinance of August 22, 1864, had only given the privilege to lay down a single track, and requires also the consent of only a majority of the abutting lot owners, instead of two-thirds, as did the previous ordinance.

Neither does it meet the difficulty to say, that the ordinance does not give the franchise—that it is the charter which gives that. It is the ordinance which gives the special privilege to lay down a track on Indiana avenue, which gives the right of the exercise of the franchise upon that street.

The position taken by counsel for appellant, that a valuable franchise of the railway company lies in its power to contract with the city for the use of the streets, and that such a grant implies an obligation not to withdraw the power, which is protected by the Constitution of the United States, and that, therefore, it is not competent for the people of the State, by their constitution, to take away from the city the power to so contract with the company, does not seem to be one which is tenable. Wherever such power, on the part of the city, had been already exercised, and the company had acquired authority from the city to lay down a railroad track on any street, there would be a vested interest, which would be protected. But where there had been no exercise of the power, it is not perceived that there was any vested interest in this respect. An expectation to be able to acquire in future, by contract with the city, authority from it to lay down railroad tracks in certain of its streets, is all that is seen here; and that can not, in my judgment, be regarded as a vested interest. The charter of the company gives it no right to the demand of authority from the city to use any street for its railroad, but leaves it in the discretion of the city to grant the authority in such manner, and upon such terms and conditions, and with such rights and privileges, as the common council, by contract, may prescribe. This is a political power delegated to the city for the purpose of government, and subject, like all similar powers, to

be modified or withdrawn at pleasure, so far as not already acted upon and rights acquired under its exercise.

Judge Cooley, in discussing the question of vested rights, says: "And it would seem that a right can not be regarded as a vested right, unless it is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable. to the present or future enjoyment of property, or to a present or future enforcement of a demand, or a legal exemption from a demand made by another;    *    *    and if, before rights become vested in particular individuals, the convenience of the State procures amendments or repeals of those laws, those individuals have no cause of complaint. The power which authorizes or purposes to give, may always revoke before an interest is perfected in the donee."

In *Aspinwall* v. *Commissioners of the County of Daviess*, 22 How. 365, by the charter of a railroad company passed by the legislature of Indiana, county commissioners were authorized to subscribe for stock on a vote of the majority of the voters of the county in favor of the subscription. An election was held on the first Monday of March, 1849. and a majority of the votes was cast for the subscription. But, before the subscription was made, the State adopted a new constitution, which went into effect November 1, 1851. One of the articles prohibited such subscriptions, unless paid for in cash, and also prohibited a county from loaning its credit or borrowing money to pay such subscriptions. In 1852, the county commissioners of Daviess county, in pursuance of the vote of the people had in March, 1849, subscribed for stock in the railroad company and issued their bonds for the amount. One of the questions presented was, whether, by virtue of its charter, and of the said election, the railroad company acquired any such right to the subscription of the county commissioners. as would be protected by the Constitution of the United States against the new constitution of Indiana, and the court held that no such right was acquired, and that the subscription was

made and the bonds issued in violation of the new constitution of Indiana.

In the case of the *Covington and Lexington R. R. Co.* v. *Kenton County Court*, 12 B. Monroe, a similar question arose, where there was in the charter of the railroad company authority given to the county to subscribe for stock in the company. A majority of the votes of the county was given in favor of the subscription. The county court then refused to make the subscription.

The proceeding was by *mandamus* to compel the county court to act. During the pendency of that proceeding, the provisions of the charter conferring the authority were repealed. The court there say: "If the legislature delegate an authority, it can certainly be revoked before the power has been exercised in such a manner as to create a vested right. Individuals have this right of revocation, and it must, from its very nature, exist in the legislature, co-extensive with the right of the latter to delegate any of the powers properly belonging to that department of the government."

It was held that the right of the company under the repealed provisions, if it could be properly denominated a right, was a mere right to make application to certain counties to take stock in the road, which they might reject at their discretion, and from which, therefore, the company might never derive a benefit, and which consequently was an advantage merely in anticipation, and of a character too unsubstantial and ideal to constitute a legal right, or to be the subject of legal protection.

Under the constitution of 1870, the legislature itself can not, by a special law, grant to any corporation or individual the right to lay down railroad tracks, and must prescribe, by a general law, the rules and conditions upon which horse railways may be operated in this State.

This company may be able to persuade the common council of the city to confer on it privileges not sanctioned by the statute law of the State. According to the claim which is made in this case, the common council have the right to go on for

Sheldon, J., Walker C. J., and Breese, J., dissenting.

the whole life of the charter of this company, some eighty years, granting to it the right to lay down railroad tracks in all the remaining streets of South Chicago, in such manner, and with such rights and privileges, as the common council, by contract with the company, may prescribe; and such authority can not be taken away without impairing the vested rights of the company in the powers of the municipal corporation. It appears to be a claim that ought not to be admitted.

To allow that this company have the right, for the next eighty years, to acquire such "special privileges" under their special charter, pertaining to the construction and operation of its railway in the streets of the South and West Divisions of Chicago, as they may induce the common council of the city to allow them, does seem to be in repugnancy with the constitution. Conformity thereto requires that the company, for the future, should take their privileges as all others do, only under the sanction of a public and general law. Equality of privilege is the principle of the constitution of 1870.

It is true that, under this constitution, no law can be passed granting the right to operate a street railroad without requiring the consent of the city; and a company organized under any general law which may be passed for such purpose, may, by consent of the city, obtain a similar special privilege as here; and it may be said, there would then exist the same objection as is here made, of there being a special privilege conferred by such consent. But there would be the difference, that the privilege so acquired would be to exercise only such guarded and restricted rights as may be allowed by a general law, to be passed, and not the special rights and privileges conferred by an antecedent special charter, and such as the common council may see fit to allow.

Mr. Chief Justice Walker, and Mr. Justice Breese, concur in the views expressed in this opinion, and dissent from the opinion of the majority.